## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LU AKU, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **17-cv-1226** |
| v. | ) | |
| | ) | |
| CHICAGO BOARD OF EDUCATION, | ) | |
| D'ANDRE WEAVER, and ILLINOIS | ) | **Judge John Z. Lee** |
| DEPARTMENT OF HUMAN RIGHTS, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lu Aku ("Aku") filed this *pro se* lawsuit against his former employer, the Board of Education of the City of Chicago ("the Board"), and D'Andre Weaver ("Weaver"), the principal at the school where Aku taught until 2014. In his initial complaint, Aku also named thirteen other defendants, a broad range of parties that included, among others, the Chicago Teachers Union, Aku's former medical provider and former attorneys, two third-party claims administrators for the Board, and the Illinois Department of Human Rights ("IDHR"). All of those additional defendants have since been dismissed except the IDHR.

In his amended complaint, Aku claims that the Board, Weaver, and the IDHR discriminated against him based on his age, sex, color, race, national origin, and disability, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and based on color, national origin, and race, in violation of 42 U.S.C. §§ 1981 and 1983. He further alleges that the Board discriminated against him on the basis of

disability in violation of the Americans with Disabilities Act ("ADA"), and on the basis of age in violation of the Age Discrimination in Employment Act ("ADEA"). Aku also claims that all Defendants retaliated against him for asserting his rights under these acts.

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), the Board[1] moves to dismiss the complaint in part, and the IDHR moves to dismiss Aku's complaint in full. For the reasons given below, the Court grants in part and denies in part the Board's motion and grants the IDHR's motion.

## Factual Background[2]

Aku, an African-American man born in 1967, began teaching science at Gwendolyn Brooks College Preparatory Academy ("Brooks"), a public school in Chicago, on August 27, 2007. Am. Compl. Ex. Equal Employment Opportunity Commission ("EEOC") Charge, at 2, ECF No. 182-2.

Aku began to experience challenges at Brooks starting the summer before the 2013–14 school year. The Board's control group ("BCG")[3] told Aku in May 2013 to

---

[1] The Board's motion to dismiss was filed on behalf of both the Board and Weaver. Board's Mot. Dismiss at 1, ECF No. 201.

[2] The following facts are taken from Aku's complaint. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (stating that, at the motion-to-dismiss stage, the court "accept[s] as true all well-pleaded facts alleged").

[3] Aku refers to actions taken by the "Board's control group" throughout the complaint. Aku explains that "Board control group is any part of Chicago Board of Education's control group, including Weaver and [the Board's Legal Department]." Am. Compl. at 17. Aku also refers occasionally to "the Board" as taking action, *see, e.g.,* IDHR and EEOC Charge #15W0909.15 at 2, ECF No. 182–5 (referring to the entity rehiring teachers as "the Board") and the Court's language aligns with his choice of words.

prepare for a 2013–14 teaching assignment as an Advanced Placement ("AP") environmental science teacher and informed him that it would arrange for him to attend AP professional development training that summer. Am. Compl. at 5, ECF No. 182. The BCG, however, failed to respond to any of Aku's inquiries about the AP training, and he was unable to participate in the training. *Id.* at 5–6.

A series of changes in Aku's teaching schedule followed. On August 7, 2013, the BCG emailed Aku to inform him that he would be teaching physics and biology, rather than environmental science. *Id.* at 6. Aku learned at a department meeting on August 20, 2013, that a young, white, female teacher would be teaching AP environmental science instead of him. *Id.* When he expressed surprise that he would be teaching biology, the science department chairperson told him to be happy he had a job. *Id.*

On August 23, 2013, the BCG told Aku that a new science teacher had been hired. *Id.* The new teacher was white and under 40 years old. *Id.* The BCG then reassigned Aku's physics sections to the new teacher and assigned Aku to four honors environmental science classes, but it did not notify Aku of the change until the morning of the first day of classes, August 26, 2013. *Id.* Aku's new schedule also did not allow him to take part in the science department's common planning time. *Id.* at 7.

A few months later, on November 23, 2013, the BCG held a staff meeting to which only African-Americans were invited (the "November Meeting"). *Id.* During the meeting, BCG told the staff that their jobs were not in danger. *Id.* Aku

3

complained to a Chicago Teachers Union ("Union") field representative about the November Meeting, but the field representative did not take any action. *Id.* Nor was any action taken by the Union when Aku emailed Union leadership and requested that they report the November Meeting to the EEOC and the IDHR. *Id.*

On April 3, 2014, the BCG summoned Aku to the hallway while he had a class in session and suggested that he leave the field of teaching. *Id.* at 8. A week later, on April 11, 2014, the BCG assigned Aku's biology and environmental science students to another teacher for tutoring and retesting, causing Aku to lose overtime opportunities and negatively impacting his next teaching performance evaluation. *Id.* at 7. The teacher who was assigned to tutor and retest those students was not endorsed in the relevant subjects. *Id.* at 8.

On April 30, 2014, Aku filed a Complainant Information Sheet ("CIS")[4] with the IDHR regarding the November Meeting. *Id.* That same day, Aku emailed the Board's Equal Opportunity Compliance ("EOC") Administrator, Donna Leaks, about the meeting, stating that he was targeted because of his race. *Id.* Leaks did not respond to the email. *Id.*

Meanwhile, Aku had injured his right ankle at Brooks on October 7, 2013. *Id.* at 7. On December 31, 2013, he visited a podiatrist, and an x-ray showed no

---

[4] The IDHR requires complainants to first submit a CIS, which asks for basic information about the claim. *Carlson v. Christian Bros. Servs.*, 840 F.3d 466, 467 (7th Cir. 2016). If the IDHR finds that it has jurisdiction, it copies the CIS information onto an official charge form, which the filer can sign and submit. *Id.* Aku attached copies of four signed charge forms as exhibits to the amended complaint. *See generally* Am. Compl., Exs. IDHR Charges, ECF Nos. 182-2–6.

broken bones. *Id.* Around June 17, 2014, Aku reported the injury to the Board and to Sedgwick Claims Management Services ("Sedgwick"). *Id.* at 8. Sedgwick generated a workers' compensation claim and told Aku that an adjustor would contact him within two weeks. *Id.* Around the same time, Sedgwick notified the Board's Legal Department of Aku's claim, and after the Board's Legal Department told Sedgwick not to contact Aku, no adjustor contacted him about his claim. *Id.*

On June 26, 2014, the BCG called Aku and told him that (1) his science teacher position was "being closed"; (2) Brooks' math and science departments would be replaced with a Science Technology Engineering and Math ("STEM") department for the 2014–15 school year; (3) STEM-position candidates needed to be dually endorsed in math and science; (4) because Aku did not hold a math endorsement, he did not qualify for any STEM positions; and (5) as a result, Aku could apply for unemployment insurance. *Id.* at 8–9. During the call, Aku asked Weaver [5] which math and science teachers had been notified of the dual endorsement requirements prior to him; Weaver did not answer the question, but he told Aku he could apply for the school's STEM vacancies that summer. *Id.*

The following day, June 27, 2014, Board Senior Management Analyst Lauren Clair-McClellan told Aku that he was being laid off because he did not possess the credentials necessary to remain on staff at Brooks. *Id.* at 9. Three days later, she

---

[5] While Aku first states that he was called by the BCG, *see* Am. Compl. at 8, he next describes that same conversation as being with Weaver, *see id.* at 9.

told him that all STEM department teachers needed to be dually endorsed in some combination of math, science, and computer science. *Id.*

On August 6, 2014, Aku took the Illinois Licensure Testing System math test, seeking a math endorsement. *Id.* That same day, Weaver interviewed Aku for a Brooks STEM teacher vacancy. *Id.* Weaver did not ultimately offer him a job. *Id.* at 16.

On or about August 25, 2014, the Board began rehiring teachers who had been laid off in June 2014 Brooks's math and science department. Am. Compl. Ex. IDHR and EEOC Charge #15W0909.15 ("Charge 15") at 2, ECF No. 182–5. The Board recalled similarly situated non-black employees and employees who were younger than 40, but it did not recall Aku. *Id.* at 1–2. No African-American science and math teachers over the age of 40 remained in the department, although one Asian science teacher over 40 retained her position. Am. Compl. at 16. The BCG had also earlier named three people to leadership positions in the STEM department. None was African-American, disabled, or had any open workers' compensation claims, and two of the three were under age 40. *Id.* at 9.

Meanwhile, Aku's April 30, 2014, IDHR CIS had not been rejected or converted into a charge. *Id.* at 8. But after he was dismissed from Brooks, Aku filed[6] a series of IDHR charges of discrimination. He filed his first IDHR charge on July 7, 2014, claiming that he was terminated from Brooks on June 26, 2014, due to

---

[6]    It is unclear on what date Aku filed the initial CIS's associated with these charges. *See* Am. Compl., Exs. IDHR Charges.

age discrimination. Am. Compl., Ex. IDHR and EEOC Charge #15W0707.03 ("Charge 03") at 1, ECF No. 182-3. Two months later, on August 7, 2014, Aku filed a second IDHR charge, alleging harassment and unequal treatment, based on age and race, from August 2013 to May 2014, Am. Compl. Ex. IDHR and EEOC Charge #15W0807.07 ("Charge 07") at 1–3, ECF No. 182-4, and discrimination and retaliation from May 2014 to August 2014, due to race and the filing of an earlier discrimination charge, *id.* at 3–4.

On September 10, 2014, Aku filed a third IDHR charge, claiming that he was not recalled back to Brooks due to his age, race, and national origin. Am. Compl. Ex. IDHR and EEOC Charge #15W0909.15 ("Charge 15") at 1–3, ECF No. 182-5. Aku then worked as a substitute teacher in September 2014 for one day, before being offered a bogus job offer and fired that same day. Am. Compl. at 7. As of October 29, 2014, he had not received pay for that work. Am. Compl. Ex. IDHR and EEOC Charge #15W1027.16 ("Charge 16") at 2, ECF No. 182-6. Aku proceeded to file a fourth IDHR charge on October 29, 2014, alleging harassment and unequal pay from April 30 to October 3, 2014, in retaliation for filing discrimination charges. *Id.* at 1.

On October 6, 2014, Leaks, the Board's EOC Administrator, called Aku and told him that the Board's Legal Department had notified her that he had filed a complaint. Am. Compl. at 10. According to Aku, the IDHR had violated its policies by notifying the Board of Aku's filings, so Aku emailed her to ask for detail on the complaint's filing date, the nature of the complaint, and the date she had been

notified of the complaint. *Id.* Leaks responded that the Board's EOC Office would meet with Aku to discuss the allegations in his April 2014 CIS. *Id.* She also told him that any complaints he filed with an outside agency would be handled by Board's Legal Department, rather than the EOC Office. *Id.*

On November 19, 2014, the Board told the Union president that Brooks' STEM teachers were required to possess dual endorsements in math and science, math and computer science, or math and Spanish. *Id.* This was different than what Aku had been told in June, as Spanish had not been discussed as an option for dual endorsement. *Compare id.* at 8–9 *with id.* at 10. The Board also told the Union president that all remaining teachers in the Brooks STEM department were dual-endorsed. *Id.*

On January 16, 2015, Aku aggravated his earlier ankle injury while substitute teaching. *Id.* at 13. On February 13, 2015, Aku's attorney had Sedgwick generate a second workers' compensation claim for the incident. *Id.* at 11. The attorney also filed two complaints on Aku's behalf with the Illinois Workers Compensation Commission. *Id.*

On February 27, 2015, Aku submitted another CIS to the IDHR, asserting discrimination and retaliation, some of which was related to his contention that the April 2014 IDHR CIS had been forwarded to Leaks. *Id.* According to Aku, during a March 12, 2015, fact-finding conference, IDHR charge investigator Judith Weingartner informed Aku that African-Americans were not a protected class under the Illinois Human Rights Act and his race-based discrimination claims therefore

8

had no merit. *Id.* In response to Aku's questions, Weingartner referred him to the IDHR Chicago Intake Supervisor, who then referred him to the IDHR Director Rocco Claps. *Id.* Aku then sent multiple letters to Claps on March 14 and March 15, 2015, asking about the agency's mishandling of the fact-finding conferences and the protection of African-Americans under the Illinois Human Rights Act. *Id.* Claps never responded, although two months later, Charge Processing Division Manager Brent Hartzman responded to one of the letters. *Id.* The response did not answer all of the questions and hypotheticals in Aku's letters to Claps. *Id.*

On April 28, 2015, Leak contacted Aku to discuss Aku's allegations of discrimination. *Id.* at 12. Aku referred Leak to the IDHR and warned her that if she contacted him again, he would complain that she was harassing him. *Id.*

Aku contacted IDHR Intake Program Administrator Raquel Guerra on May 1, 2015, and requested the agency's determination regarding an additional CIS that he had filed on March 16, 2015, which included allegations that the Union and Sedgwick were aiding and abetting the Board's discrimination and retaliation. *Id.* Guerra responded that the IDHR could not investigate the manner in which Sedgwick processed its claims and told Aku that the IDHR had ignored Aku's complaint that the Union had aided and abetted the Board. *Id.* Aku then emailed Guerra a series of questions. *Id.*

On June 23, 2015, Aku emailed evidence of his charges of discrimination to Weingartner, copying Guerra. *Id.* Weingartner told Aku to stop submitting evidence, but he did not tell him—as he would later find out—that information for

9

cases should be provided to the IDHR via fax or email. *Id*. at 12, 14. On July 29, 2015, the IDHR dismissed Aku's four charges of discrimination, claiming that there was a lack of substantial evidence. *Id*. at 18. Aku then filed four requests for review of the IDHR decisions with the Illinois Human Rights Commission. *Id*. None of those requests for review have been adjudicated. *Id*.

On or around August 26, 2015, the Board told Aku that he was qualified to be reassigned as a teacher and offered him a job. *Id*. Aku then emailed and faxed Angela Mason-Johnson, the Board's Director of Staffing Services, and Kathryn Gray, the Board's Program Coordinator, to accept the offer and inform them that his teaching license had expired because of untimely workers' compensation approval and unpaid total temporary disability benefit payments ("TTD"). *Id*.

Gray instructed Plaintiff to attend a September 3, 2015, reassigned teacher orientation for newly hired reassigned teachers, but on that date, she told him that he was not qualified to be a reassigned teacher. *Id*. at 14. On September 7, 2015, Aku emailed Gray to ask the latest date he could accept the reassigned teacher job offer, explaining that he had not received overdue TTD payments and thus did not know when his educator license could be updated. *Id*. Gray never responded. *Id*.

In the meantime, Aku had undergone arthroscopic outpatient surgery on September 4, 2015. Aku was released by the doctor to full-duty work during a November 10, 2015, post-surgery follow-up appointment, even though he complained of pain and impairment. *Id*. During an appointment on December 15, 2015, after Aku again complained of pain and impairment, the doctor prescribed

physical therapy, durable medical equipment, and prescriptions for pharmaceuticals. *Id*. The Board's Legal Department still has not approved the prescriptions. *Id.*

On March 5, 2016, the Board terminated Aku because he failed to report back to work. *Id*. Aku filed a charge with the EEOC on November 9, 2016, broadly claiming differential treatment and termination by the Board on the basis of disability, race, national origin, color, and sex, as well as retaliation for asserting his rights. Am. Compl. Ex. EEOC Charge, at 1, ECF No. 182-1. Aku received a right-to-sue letter from the EEOC on December 20, 2016. *See id*. He initiated this suit on February 15, 2017.

## **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, when considering motions to dismiss, the Court accepts "all well-pleaded factual allegations as true and view[s] them in the light most favorable to the plaintiff." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013) At the same time, "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). As such, "[t]hreadbare

recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## Analysis

### I. Claims Against the IDHR

Aku claims that the IDHR discriminated against him on the basis of age, sex, color, race, national origin, and disability, as well as by aiding and abetting such discrimination, in violation of Title VII, and on the basis of color, national origin, and race, in violation of 42 U.S.C. §§ 1981 and 1983;[7] and that it retaliated against him for asserting his rights under these acts. Am. Compl. at 15. The IDHR moves to dismiss Aku's claims against it in full. IDHR's Mem. Supp. Mot. Dismiss ("IDHR's Mem. Supp.") at 1, ECF No. 195. Aku does not respond to any of the IDHR's legal arguments, instead merely reasserting the factual allegations from the amended complaint. *See generally* Pl.'s Resp. IDHR's Mot. Dismiss, ECF No. 204.

### A. Title VII Claims

The IDHR seeks to dismiss the Title VII claims against it on the basis that it is not Plaintiff's employer. IDHR's Mem. Supp. at 5. A plaintiff "must prove the existence of an employment relationship in order to maintain a Title VII action" against a defendant. *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991). If the defendant is not the plaintiff's direct employer, the

---

[7] Aku describes his §§ 1981 and 1983 claims as premised on "civil rights violations" in his claim summary on page 15. *See* Am. Compl. at 15. Aku earlier clarifies that his § 1981 claims (and hence his § 1983 claims, *see infra*) are premised on color, national origin, and race discrimination. *See id.* at 2.

12

plaintiff must allege facts indicating a *de facto* (or indirect) employment relationship. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015) (citing *Knight*, 950 F.2d at 378–79).

In its November 14, 2017 opinion, the Court found that Aku failed to state a Title VII claim against multiple defendants because he had failed to allege facts indicating the existence of an employment relationship with those defendants. *See* Memorandum Opinion and Order of 11/14/2017 ("November Opinion") at 23, ECF No. 158. As Aku does not plead any facts in the amended complaint indicating that he had an actual or *de facto* employee-employer relationship with the IDHR, and did not respond to the IDHR's arguments regarding the Title VII claims, the Court grants the IDHR's motion to dismiss the Title VII claims against it for the same reason. Because Aku has failed to address these deficiencies in his amended complaint, these claims now are dismissed with prejudice.

## B. Section 1981 and 1983 Claims

The IDHR also moves to dismiss Aku's §§ 1981 and 1983 claims, contending that (1) there is no private right of action against state actors under § 1981 and (2) the IDHR is not a "person" within the meaning of § 1983. IDHR's Mem. Supp. at 7. The Court agrees with both arguments.

It is clearly established that "42 U.S.C. § 1981 does not create a private right of action against state actors." *Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014); *accord Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895 n.5 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 1614 (2017). Aku does not

13

dispute that the IDHR is a state actor, and the Court therefore grants the motion to dismiss the § 1981 claims with prejudice on this basis.

As for Aku's § 1983 claim against the IDHR, individual States and state agencies do not qualify as "persons" amenable to suit under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Joseph v. Bd. of Regents of Univ. of Wis. Sys*, 432 F.3d 746, 748 (7th Cir. 2005) (holding that a state agency, as an "arm of the state," is accorded the same treatment under § 1983 as states and state officials). Aku has therefore failed to state a claim under § 1983 against the IDHR. The IDHR's motion to dismiss all claims against it under § 1983 is accordingly granted with prejudice.

Because Aku only asserted Title VII, § 1981, and § 1983 claims against the IDHR,[8] and all those claims are dismissed, the Court need not address IDHR's other grounds for dismissing Aku's claims.

## II. Claims Against the Board and Weaver

Aku claims that the Board and Weaver, in his individual capacity, discriminated against Aku based on age, sex, color, race, national origin, and

---

[8]     Aku neatly summarizes his claims against the three remaining Defendants on page 15 of the amended complaint. Am. Compl. at 15. Although Aku uses conclusory legal language throughout his amended complaint, *see, e.g., id.* at 3 (stating that Defendants had "assaulted Plaintiff by proxy via agents" in the healthcare, legal, labor, and insurance sectors; *id.* at 5 (describing the Board and the IDHR as engaging in a "discriminatory civil conspiracy"); and *id.* at 4 (stating that Defendants "racketeer[ed]" in the healthcare, labor, and legal sector), the Court construes that language as providing examples of the ways that Defendants violated the statutes under which Aku brings his claims on page 15, rather than asserting additional separate claims.

disability, as well as by aiding and abetting such discrimination, in violation of Title VII; discriminated against him based on color, national origin, and race, in violation of 42 U.S.C. §§ 1981 and 1983; and retaliated against him for asserting his rights under those acts. Am. Compl. at 2, 15. He further claims that the Board violated the ADA by discriminating against him on the basis of disability, violated the ADEA by discriminating against him on the basis of age, and unlawfully retaliated against him for asserting his rights under those statutes. *Id.* at 15.

The Board moves to dismiss the Title VII claims against Weaver, as well as all §§ 1981 and 1983 claims against the Board, any disability discrimination and associated retaliation claims brought under Title VII, any aiding and abetting claims brought under Title VII, and any claims for injunctive relief.[9]

## A.    Title VII Claims against Weaver

Aku brings Title VII claims against Weaver exclusively in his individual capacity. *See* Am. Compl. at 15. As the Board points out, the Court dismissed all individual capacity claims against Weaver in its November 14, 2017 order, holding that Seventh Circuit law clearly forecloses individual liability under Title VII. *See* November Opinion at 13 (citing *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995)).

---

[9]    The Board also moves to dismiss "any conspiracy claim against the Board and/or Weaver due to failure to state a claim on which relief may be granted." Board's Mot. Dismiss at 2. Because the Court construes Aku as only bringing the claims he specifically names on page 15, *i.e.,* violations of Title VII, §§ 1981 and 1983 (against the Board and Weaver), and the ADEA and ADA (against the Board), the Court need not address those arguments.

Aku does not respond to the Board's motion with respect to these claims, other than to note that Weaver "conspired against and repeatedly wronged Plaintiff." Pl.'s Resp. Board's Mot. Dismiss ¶ 2, ECF No. 205. The Court thus grants the Board's motion to dismiss all Title VII claims against Weaver with prejudice. The only remaining claims against Weaver, which the Board does not seek to dismiss, are §§ 1981 and 1983 claims against him in his individual capacity.

### B.    Section 1981 and 1983 Claims Against the Board

Aku asserts both 42 U.S.C. §§ 1981 and 1983 claims against the Board. As noted in the November Opinion, *see* November Opinion at 15, § 1981 does not provide a cause of action against state actors. *Campbell*, 752 F.3d at 671. Because § 1983 remains the exclusive remedy for violations of § 1981 committed by state actors, *see id.*, the Court again construes Aku's § 1981 claims as claims under § 1983.

The Board next contends that, as for the § 1983 claims, Aku fails to state a *Monell* claim against the Board. *See* Board's Mot. Dismiss at 5, ECF No. 201; *Monell v. City of N.Y. Dep't of Soc. Servs.*, 436 U.S. 659 (1978). As the Court noted in the November Opinion, a plaintiff with a § 1983 claim against a state actor must show that the constitutional deprivation was committed pursuant to government policy, custom, or practice. *See* November Opinion at 15–16. To establish liability under *Monell*, a plaintiff must demonstrate: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final

16

policymaking authority." *Waters v. City of Chi.*, 580 F.3d 575, 581 (7th Cir. 2009) (citing *Monell,* 436 U.S. at 694).

In the November Opinion, the Court determined that all of Aku's claims of color, national origin, and race discrimination related to the actions of the Brooks administration, meaning that Aku had failed to demonstrate a Board-wide policy or practice of discriminating against teachers on the basis of color, national origin, or race. *See* November Opinion at 16. The Court further found that Weaver did not qualify as a "final policymaker" for the Board because, under Illinois law, the right to employ and discharge teachers is vested solely with the Board. *See id.* at 17 (citing *Wragg v. Vill. of Thornton*, 604 F.3d 464, 468 (7th Cir. 2010); 105 Ill. Comp. Stat. 5/34-8.1). The Court thus concluded that Aku had not pleaded facts supporting a plausible *Monell* claim against the Board. *Id.*

According to the Board, Aku's amended complaint still fails to allege facts evincing a Board-wide policy or practice of discriminating against teachers based on color, national origin, or race. Board's Mot. Dismiss at 5–6. The Court agrees. While Aku's factual allegations could be construed, at best, as indicating that the Brooks administration discriminated against African-American teachers in staffing one department for the 2014–15 school year, Aku does not offer any factual allegations supporting the proposition that the discrimination was "so permanent and well-settled that it constitutes a custom or practice" of the Board. *See Waters*, 580 F.3d at 581. "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that

17

there is a policy at work." *Lewis v. City of Chi.*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 789 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). But Aku does not plead facts from which the Court could reasonably infer that such discriminatory firing and hiring extended beyond the staffing decisions for the Brooks STEM department for the 2014–15 school year,[10] and as such, cannot demonstrate a Board-wide policy or practice.

Nor does the amended complaint indicate that any discriminatory hiring or firing decisions were made by a final policymaker. *See Waters*, 580 F.3d at 581. According to Aku, he was informed that his position was "being closed" and that he was unqualified for the available positions the following year, on June 26, 2014, in a phone call from either the "Board control group" or Weaver.[11] Am. Compl. at 8–9. Aku also states that the "Board control group" was responsible for dismissing African-American STEM teachers at Brooks while retaining younger white teachers. *Id.* at 16. While Aku explains that he uses the term "Board control group" to refer to "any part of the [Board]'s control group, including Weaver and Legal," Am. Compl. at 17, his response to the Board's motion to dismiss makes clear that the relevant hiring and firing decisions were made by Weaver. *See* Pl.'s Resp.

---

[10] Aku also alleges that he was also terminated from a two-day substitute teaching position at another school, *see* Am. Compl. at 9, but he does not plead facts supporting a discriminatory reason for that termination.

[11] While Aku first states that he was called by the BCG, *see* Am. Compl. at 8, he next describes the same call as being with Weaver, *see id.* at 9.

Board's Mot. Dismiss ¶ 9 ("Weaver set policy for hiring and firing. . . and Weaver then fired them for not being in line with his policy . . . ."). As noted, the Court has previously held that decisions by a principal cannot qualify as those made by a "final policymaker" attributable to the Board for *Monell* purposes.[12] *See* November Opinion at 17 (citing *Wragg*, 604 F.3d at 468; 105 Ill. Comp. Stat. 5/34-8.1).

Because Aku did not plead any facts indicating that there was a discriminatory Board policy or custom, or that any qualified decisions were made by a Board "final policymaker" under *Monell*, the Court grants the Board's motion to dismiss all § 1983 claims against the Board, and those claims are dismissed with prejudice.

### C.    Claims Under Title VII for Disability and Aiding and Abetting

Aku asserts that the Board violated Title VII by discriminating against him on the basis of age, sex, color, race, national origin, and disability. The Board moves to dismiss any disability discrimination and associated retaliation claims under Title VII, arguing that disability is not a protected class under Title VII. In response, Aku asserts that, while his "disability claim is under the ADA," the "Board has repeatedly used his disability and impairment to retaliate against him in violation of Title VII." Pl.'s Resp. Board's Mot. Dismiss ¶ 11.

---

[12]    Aku also alleges that, the day after his position was terminated by Weaver, a "Board Senior Management Analyst" reiterated to Aku that he was being laid off because he lacked the credentials necessary to remain on staff at Brooks. Am. Compl. at 9. Because Aku's allegations indicate that the policy was set by Weaver, *see* Pl.'s Resp. Board's Mot. Dismiss ¶ 9, the Court does not analyze whether someone in such a position could qualify as a final policymaker under *Monell*.

19

Title VII prohibits discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). The statute does not mention disability, and courts uniformly hold that disability discrimination claims cannot proceed under Title VII. *See, e.g., Ruben v. Potter*, No. 06 C 2441, 2007 WL 2875674, at *1 (N.D. Ill. Sept. 28, 2007) ("[I]ndividuals with disabilities are not a protected class under Title VII."); *accord Magnus v. St. Mark United Methodist Church*, No. 10 C 380, 2010 WL 4177614, at *4 (N.D. Ill. Oct. 19, 2010); *E.E.O.C. v. Supervalu, Inc.*, 674 F. Supp. 2d 1007, 1011 (N.D. Ill. 2009). Aku therefore cannot proceed on a disability discrimination claim under Title VII. Nor can he proceed on a retaliation claim related to his disability under Title VII. *See Tarpley v. City Colleges of Chi.*, 87 F. Supp. 3d 908, 913 (N.D. Ill. 2015) (holding that "Title VII only covers . . . retaliation on the basis of an individual's 'race, color, religion, sex, or national origin'" and therefore the plaintiff could not proceed on a disability retaliation claim under Title VII).

Aku also asserts that he is bringing Title VII claims for employment discrimination against the Board for "aiding and abetting," although it is unclear whom Aku alleges that the Board was aiding and abetting. *See* Am. Compl. at 15.

The Board contends that any aiding and abetting claims under Title VII must be dismissed on the grounds that Title VII does not provide for aiding and abetting liability. Board's Mot. Dismiss at 8. The Court agrees. Aiding and abetting claims are not permitted under Title VII because so permitting would expand the scope of liability beyond a plaintiff's employer. *See Love*, 779 F.3d at 701–02 (holding that

20

Title VII liability is limited to a plaintiff's direct or *de facto* employer). To the extent that Aku claims that the Board aided and abetted violations of Title VII, then, that claim is also dismissed with prejudice.

### D. Claims for Injunctive Relief

Aku requests a wide range of injunctive relief, including that the Board and "Illinois" testify as to various issues, the Board approve Aku's prescriptions, and the Department of Justice undertake an investigation of Defendants. Am. Compl. at 19–20. Aku also describes his requested relief, at one point, as an "order of injunction." *See id*. at 21. The Board moves to dismiss Aku's "claim for injunctive relief," contending that he has failed to state a claim for a permanent or preliminary injunction under Rule 12(b)(6). Board's Mot. Dismiss at 10–11.

But the Court does not construe Aku's amended complaint as stating a separate claim for a preliminary or permanent injunction. Instead, the complaint appears to request a wide variety of relief related to his claims under Title VII, §§ 1981 and 1983, ADA, and ADEA. This interpretation of the complaint also aligns with Federal Rule of Civil Procedure 8(a), under which a request for injunctive relief is not a separate legal claim. *See* Fed. R. Civ. P. 8(a)(2)–(3) (A claim for relief must include both "a short plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought."); *Bontkowski v. Smith,* 305 F.3d 757, 762 (7th Cir. 2002) (explaining that the demand for judgment "is not itself a part of the plaintiff's claim"). Aku therefore does not need to plead any requirements for preliminary or permanent injunctions, as Defendants contend he

21

does. *See* Board's Mot. Dismiss at 11. The Court accordingly denies the Board's motion to dismiss Aku's request for injunctive relief.

## Conclusion

For the reasons stated herein, the Court grants the IDHR's motion to dismiss [194] the claims against it in full, and they are dismissed with prejudice. There are no remaining claims asserted against IDHR, and IDHR is accordingly terminated as a Defendant.

The Board's partial motion to dismiss [201] is granted in part and denied in part. The Court grants the Board's motion to dismiss Title VII claims against Weaver, as well as all § 1981 and § 1983 claims against the Board, any Title VII disability discrimination and associated retaliation claims against the Board, and any claims that the Board aided and abetted violations of Title VII. These claims are dismissed with prejudice. The Board's motion to dismiss Aku's request for injunctive relief is denied.

The following causes of action against the Board remain: Title VII color, national origin, race, and sex discrimination claims; ADEA age discrimination claims; ADA disability discrimination claims; and associated retaliation claims under these statutes. The § 1981 and § 1983 color, national origin, and race claims against Weaver in his individual capacity also remain.

22

The status hearing previously set for June 14, 2018, stands.

**IT IS SO ORDERED.**          **ENTERED   6/14/18**

_____
**John Z. Lee**
**United States District Judge**